The case is 20-1070 United States v. Xiang, and I think Ms. Shen and Mr. Meyrie, how much are you going to split it evenly? Is there a different distribution? We're planning to split it about evenly, but I'll just pass it off to Mr. Meyrie, keeping my own time. Great. You may proceed when you're ready. Good morning, Your Honors, and may it please the Court. My name is Kathleen Shen, and I represent the appellate, Ms. Yolan Xiang. The District Court's denial of the suppression motion should be reversed, because any finding of probable cause was necessarily based on Officer Padilla's reckless conflation of my client, Yolan Xiang, with Youtang Xiang. I want to begin by emphasizing what the warrant does not say. Nothing in the warrant connects Ms. Xiang's home with the broader investigation into Chinese drug trafficking organizations. There's information in the warrant about other Chinese people who are known to engage in illegal marijuana cultivation, and about other Chinese people who are connected to them by law enforcement surveillance. And there's also information in the warrant about other Chinese people whose homes smelled like marijuana, who were the subject of tips about marijuana cultivation, or who had installed high-pressure fans on their homes. But there's no such information about Ms. Xiang or Mr. Yang. It's in the same neighborhood, isn't it? They're not all in the same neighborhood, Your Honor. They're all in Aurora. But, for example, you know, the Nevada Place address and the Doan Drive, you know, which I'll get into later, they're actually like nine miles apart. How about the two Doan Drive addresses? I mean, you could probably hit one house with a rock from the other. You're right, Your Honor. There are some houses that are in the same neighborhood. That's true. So there is some, I mean, I'll give it to you that maybe the evidence is a bit thin. There is, I mean, some evidence in addition to just them having a house there. Your Honor, I think you could consider the fact that their house is located near other houses that have high electricity usage. I would note, however, that the other house on Doan Drive also seems to be based purely on high electricity usage. So, you know, once we get to that point, I mean, you could say there's nothing to say that this is more likely to be marijuana growth than mining Bitcoin, for example. And you know, just to sort of proceed, the government is really inviting the court to fill in these blanks and just assume that the same investigative techniques that led to the uncovering of marijuana cultivation with some of these other people also were applied to my clients and uncover some connection to them. But, you know, this court's precedents forbid that. Probable cause has to be based on specific facts, not just on the officer's conclusions from unstated facts. And so, you know, for that reason, I think it's really important to just set aside this kind of idea that there is a connection to an unstated connection to the other Chinese drug traffickers. Well, can you explain to me kind of your interpretation of how we we started at East Nevada and ended up at Doan? How did how did the how did your client's house get on the task force's radar screen? Your Honor, the affidavit doesn't say it's just not in there. So, you know, I don't know what led to that. I mean, I think that's part of the problem with the the affidavit. Right. It doesn't say what led to the suspicion. It just asserts that it is a suspicious home. And the only suspicious fact, like I said, is this high electricity usage. And so, you know, don't don't don't we know from the suppression hearing how Don got on the on the officer's radar screen? Your Honor, I don't believe that we do know. I mean, my understanding is that there's just that they responded to the house. I do want to talk about the putative connection with Nevada Place. You know, that's the only other information that the affidavit provides. It seems to connect my client to any other suspected drug trafficking. But that information was false and it was recklessly false. And so I want to both explain why it's false and then why that why it's falsehood. Its inclusion was reckless. So first, before you go ahead, before you start, the district court judge here made a specific finding that that error was not reckless or intentional, but only negligent. So do you have to meet a clear error standard here? Yes, Your Honor. In the 10th Circuit, it's a clear error standard to reverse that finding. I recognize that that's a that's a big lift, but I think we can meet it. And, you know, I want to I want to explain why. And so, you know, just to be clear, I think it can be really confusing to talk about what the misrepresentation here. But I think it's worthwhile emphasizing there is no person named Yeo Xiang. There's a Yeo Tang Xiang who lived at Nevada Place and drove a BMW. And then there's a Yeo Lan Xiang who lived at Doan Drive and drove a RAV4. And so any statement referring to a person named Yeo Xiang and indicating that that person lived at but was connected to both houses or to both cars is false. Just like, you know, if I were to tell you that the president of China was a man named Xi Jinping, that would be wrong. That's not his name. His name is Xi Jinping. OK, and and I think that that mistake was not just negligent, but it was reckless. And here, you know, I really want to draw attention to the legal standard for what recklessness means in this conduct. You know, a misrepresentation to a magistrate judge is reckless if it is made despite obvious reasons to doubt its veracity. And here there's many obvious reasons that Officer Bidia should have doubted his conclusion that a person named Yeo Xiang existed and was connected to both houses. First, as a matter of common sense, different people can have similar names. We know this from everyday experience. And it's obvious that you can't assume two people who have similar names are the same person. That's why institutions rely on birthdates, social security numbers, fingerprints to identify people. And then second, the names are actually different. Yeo Xiang is not the same name as Yeo Lan Xiang. And even the clear report that the government relied on at the suppression hearing indicates that they had a different middle initial. It's Yeo Ti Xiang. Third, the names belong to people who lived at different addresses. Fourth, drove different cars. And fifth, this is also from the clear report by the government. They had different birthdays. The birthday given for Yeo Lan Xiang is March 15th, 1969. And the birth date given for Yeo Ti Xiang is June 1985. So, you know, however strange the Chinese names may have appeared to the officer, surely he understood that Chinese people also only can have one birthday. What is the birthdate information made available to Officer Padilla? So Officer Padilla testified that he had the clear, that he used the clear database record when he was putting together the affidavit. That's at volume 2695. Now, the clear record that's in, that's part of the record, isn't what he used at the time. He didn't have that record anymore. He lost it. So they ran the database report afterwards. But the assumption is that that's the same database. And then finally, you know... But that clear report showed Doan as a related address to Nevada Place, right? Yes, and that was the point the government made. But I think it's notable that it shows they have different names and different birthdates. And so, you know, even with this kind of confounding information that maybe these addresses were somehow related, that at least gives you reason to doubt the truth of the assumption that these are the same person and that the same person owns two houses. And then finally, I think Officer Padilla's own testimony that he knew that Chinese names, quote, often get kind of jumbled together depending on who is entering the names, which can result in, quote, confusion. And this is from volume six of the record at page 722. I think that's another reason he should have doubted the veracity of his assumption regarding these two different Chinese names and assuming they belong to the same person. He knew that mistakes were often made when Chinese names were reported. And in fact, he actually made that same mistake in drafting the affidavit. He changed Yolansiang's name from Yolansiang to Youxiang within one paragraph. And, you know, the government suggests... The clear report had, you know, multiple listings of that name with kind of different manifestations of it as well. That's true, Your Honor. And I, you know, and I, it's kind of, if it's an input, you know, inputting error, it's going to kind of live in the document until it's corrected. And, you know, there was some, as I was going through the clear reports, oh, you know, there's a bunch of inconsistencies on the naming convention. That's true, Your Honor. There are these inconsistencies. Mistakes are often made. But I think what that should have told Officer Padilla, just like it, you know, especially when you take in all the information, including the different birth dates, is that this information isn't reliable. And that this assumption that he's making that they're the same person, he has reason to doubt that it's true. You know, the government and Officer Padilla kind of suggest, oh, you know, the fact that Chinese names are confusing, sort of is mitigating or exculpatory in this context. But I think the opposite is true. If you know that there's something, these mistakes are often made, that Chinese names are often misreported, and that this information isn't reliable, that increases your obligation to double check your assumption. It doesn't decrease it. And I think this is where the Second Circuit decision in Hernandez is really instructive. You know, there's a similar situation where Spanish names are often misreported. Sometimes they drop the second surname. You know, sometimes one or the other surname is reported. And what the Second Circuit says is, you know, a lack of cultural familiarity doesn't excuse disregarding obvious differences. You know, in that case, you had Luis Hernandez and then Luis Enrique Hernandez Martinez. And they say, you don't get to just assume that this discrepancy is in your favor. You have to you have to look at it. And I think the same reasoning applies here. You know, there's bad information about these names. He knew there was bad information about these names. There were things that should have triggered his, you know, that we all just the baseline assumption that different people can have the same name, and also that one person can't have two birthdays. One person can't have two different middle names. All of these things were reasons for him to doubt the truth of his assumption that they were. But what about the similarity of the names when you combine it with the clear report listing the Nevada place as a related address? You know, I think that's something that is, you know, the government relies on that. And I understand why they do. It does suggest maybe they're related. But the clear report also says they have different middle names and different birthdays. You know, it says that Yotis Young is someone born in June 1985, and that Yolanda Young is somebody born in March 1969. So just on the face of the record, it's inconsistent. And there's no way to, you know, I think that is just a huge red flag. You can't just say, well, the clear report is wrong about their birthdays, but it's right about the association between the addresses. Something about the clear report is not right. And it would have been trivially easy for him to verify that these were different people. I mean, he literally had that information at his fingertips. Well, they made that mistake. And then the next step is they went and obtained the energy records, which showed the high usage, you know, which is pretty amazing for the mistake that happened in this case. And I can't remember from the record, did the Nevada play show high energy usage? Yes, Your Honor, they both had high energy usage. And so that is... So that, you know, they have good intel on Nevada, presumably. And then, you know, better intel, because they had more information there, I believe, than don't. And they run the energy report. Nevada, then they, you know, they maybe wrongly have ID'd your client, and they get a high energy report there. And, you know, it's consistent with what the task force is finding around town. You know, I'm sure you and Mr. Myre will get to this, but there might be some innocent explanations for, you know, nine times regular energy consumption. But isn't it, you know, pretty suggestive in kind of the Colorado illegal marijuana legalization market and a lot of these bootleg grow operations? Isn't that really a fairly substantial red flag, supporting an inference of a drug grow operation? Your Honor, I do want to get to the electricity. And I agree, it is an indicator of marijuana use, or illegal marijuana growth. But it's equally consistent with, for example, mining Bitcoin. I just looked this up. It takes 51,000 kilowatt hours of energy to mine a single Bitcoin. So, you know, 9,000 kilowatt hours of energy in one month gets you 0.2 Bitcoin. Was that a thing in 2018? I think it would have actually made more sense back in 2019. I'm not actually sure. But, you know, that would have been a great investment, honestly, mining Bitcoin. You know, once you... I think you have to take out the connection to Nevada Place. And then because, like I said, it's reckless. And then once you look at it without the connection, just the elevated electricity usage alone isn't enough to get you to probable cause. Even if you, you know, consider it highly consistent with illegal marijuana cultivation. Like I said, it's just as consistent with mining Bitcoin. And with respect to my client's house, there's nothing that says it's more likely that she's growing marijuana than mining Bitcoin. I mean, you know... They don't have to rule out an innocent explanation. They don't have to rule out. But if it's equally consistent with an innocent explanation, that's not probable cause, right? I mean, I don't know that we've ever gotten to like exact percentages, but where there's... You know, you don't have to eliminate like imaginary or speculative innocent explanations. But when an innocent explanation is equally consistent, that's not probable cause. And that's why no court has ever found probable cause based on elevated electricity usage alone. In those cases, you're looking at an individual home with an elevated energy use. Here, you've got an investigation that is taking place in a neighborhood. And yeah, there's a couple of houses that are outliers. And some of those houses, in addition to the energy use, they also have the odor of marijuana and people calling in and giving tips, right? And so it's not just one house with high energy use. It's a pattern that they're seeing that's consistent with a conspiracy that they prosecuted, I guess, I don't know how many years before. But so it's all part of the analysis here. Just have a couple of responses to that. First, like I said, they don't actually connect my client to any other drug traffickers. You know, and you can take into account that they're all located about in the same area. But I do think it's notable that my client's house didn't smell like marijuana, didn't have the fans, wasn't the subject of any reports. And, you know, finally, I think, you know, this is something that the district court touched on, that they were all Chinese. You know, there's over 20,000 Asian residents in Aurora. And I just don't think that the fact of their ethnicity, even if you consider it to be part of the probable cause analysis, is really probative enough to get you over the line from saying, you know, do we know that these people, do we have reason to believe that these people are more likely to be growing marijuana in their basement than they are to be mining Bitcoin or any other, you know, farming orchids. And with that, I'd like to pass off the time to my co-defendant counsel. Thank you, counsel. The case intrigues me because there's another Timothy Temkevich in town that I, my cousin, so I understand the dilemma here. Mr. Myrie? May it please the court and counsel, I'm Blaine Myrie, counsel for the co-appellant, Wanyu Yan. And I think Ms. Shen has touched on a lot of what the problem is in this case. And it is that we have this large drug trafficking operation, but we have no connection to our clients in our client's home other than they have Chinese names. And they showed up in a, what I would call, seriously flawed government database that identified our client, well, my client's wife, as being connected to an address that she has no connection to. And their house was in proximity to at least one of the other houses that they were investigating. Yes, yes, that is true. But are we going to allow probable cause based on what happens in a neighbor's house? Because the neighbor is using high electrical consumption, does that justify concluding that our high electrical consumption must be a marijuana use? What if they had eight houses in a two block range, and a number of them they had dips on, and they were all using high rates of electricity? I mean, does it suggest that your client's house might be more suspicious than it would be if it was just sitting there by itself? I think the answer is yes, but I think you also need other indicia, because if we're just going to rely on, wow, look at all this massive electricity usage, then as the court said in the Wisconsin case, I cited in my brief, the District of Wisconsin, law enforcement could simply just search the records of the utility companies and come up with high energy usage and go and get a warrant based on that. And I think that would be an affront to the privacy protections of the Fourth Amendment, particularly when it comes to an individual's dwelling. And there are no other indicia of a marijuana grow at our client's house. There's no evidence of surveillance of things being brought in, brought out, equipment being brought in, brought out, of marijuana odor emanating there. And now the government, I think, does a little bit of sleight of hand where they try to say, well, the fact that that wasn't there indicates that they took good steps to hide it. Well, I think that puts the cart before the horse, because essentially you could view that argument as saying, well, if it is marijuana odor emanating, it's suspicious. And if there's not, but there's high electricity consumption, it is also suspicious. Well, it's a lose-lose for anyone who wants to protect their Fourth Amendment privacy rights. I do want to turn again to the CLEAR report, because I think it's more problematic than even Ms. Chen indicated. If you look at, you know, the government introduced a four-page excerpt, but the defense introduced Defendant's Exhibit A, which is at page 99 to 118 of Volume 2 of the record, sealed record. And that has more parts, more pages from that. And if you look at specifically page 114, there you have the, and I apologize, I don't have the fluency to pronounce these names correctly, so I'm going to try. The Yiu-Tung Chiang, the Nevada place gentleman. You have not only, you have him listed as a potential relative, which I don't know where they got that from, but so be it. But you have his Social Security number, which is a different Social Security number. And you also have another birth date, which is 1960. So you have three different birth dates, two different Social Security numbers, and variations on these names. And the only reasonable conclusion from this information is that there is at least two people who have Y-O-U as part of their first name or part of their name, and Chiang as the last name or part of their name. And based on that, I think disregarding that and concluding they're the same person, no reasonable officer should have done that. And no reasonable officer who looked at it would have said, okay, it's all the same person. You've got two Social Security numbers, three birth dates, two addresses, two different cars, and the cars were never seen at the address at which they weren't registered. So there's no connection between the cars other than this discrepancy over the name. So I think that it was an obvious error. It was an obvious situation and discrepancy that called out for additional review by Officer Padilla before he swore the affidavit. And I think it therefore, because it was obvious, it is also an obvious error for purposes of clear error analysis. And I think Judge Moore's conclusion was clearly erroneous, and that this is a reckless disregard. So the Leon exception does not apply and the evidence should be suppressed. I want to spend just one minute on my separate conspiracy issue and largely go from what's in the briefs. Essentially, the government's argument is, and if this court believes the government's argument, well, we know the consequence of that. But the government's argument is these people were married. They shared the same house. Therefore, she knew what was going on in the basement. Now, given an ordinary house like I have where the basement door is not locked, I think that is a reasonable inference to draw. But here you had the evidence that showed that the basement was locked by a separately installed lock and key. You have no evidence. The only testimony you have is my client's wife testifying that she had never gone in the basement since they looked at the house. You have the officer's testimony that there was a lock on the basement door. And if I recall correctly, they had to breach that lock. You have no evidence that Ms. Chiang had a key and therefore had access to the basement. Well, don't they also make an argument that it doesn't have to be on Mrs. Chiang, that it could be an unidentified co-conspirator? Because there was plenty of testimony. First of all, this is a marijuana selling operation. The drying portion isn't in the house. So he's got to be working with someone to dry it. That the fans and the equipment necessary was very heavy and would have taken more than one person to set it up. I mean, there was plenty of testimony that he had to be working in concert with someone, wasn't there? There was expert testimony about what they speculated had to be done. But I believe, if I recall correctly, the government's expert said that for one person to set this up by himself would take three to four weeks. So yes, it is possible to do this by yourself. Well, I mean, there was plenty of evidence from which the jury could conclude that he was working with someone because, among other things, why is he growing the marijuana if he's not going to dry it and sell it? You know, we've got 100 plants of marijuana. Your Honor, I believe that, first of all, there is no evidence to tie my client to any other person. I understand that they are unidentified alleged co-conspirators, but there is no evidence of any of that related to my client. All there is is what was seized in the basement that day. But there is female clothing in the house, and neither one of them had a job, right? So why wouldn't, you know, one sell... My understanding is they both worked in restaurants. Okay. What about the idea that Ms. Xiong took the stand and testified, haven't been in that basement since before we bought the house, don't know what he was doing because I didn't ask questions. I just did what I was told. I don't even live there. I live in, I can't remember where she said she lived. And, you know, but then there was impeachment evidence on those things. What if the jury just said, you know what? Sounds like a lie to me. Don't think you're credible. And so the corollary to her testimony, if the jury finds that it's not true, is that she had been in the basement. She did know what was going on. And she was part of it. I mean, isn't that a necessary conclusion if they found her to not be credible? Well, your honor, I note that the government relies on a second circuit case in addressing this issue and says, which says the jury is free to draw negative inferences from an untruthful witness's testimony, as long as there is affirmative testimony to supplement or corroborate these negative influences. And it's my position that that evidence doesn't exist, and therefore those inferences can't be drawn. But unless there are further questions, I would like to save the last few minutes for rebuttal, which Ms. Shen will be giving. Thank you. Let's hear from Mr. Teitelbaum. I please the court, Aaron Teitelbaum for the United States. There's really three points that I'd like to make about the search warrant affidavit. First of all, as the court's already observed, there's three components to probable cause that the magistrate could have reasonably relied on in issuing the warrant. The elevated electricity usage is one. The linkage with the license plate between Nevada Place and Doan Drive is the second. And the third is the investigative methodology that identified all of the target residences, including the Doan Drive residents. What's the investigative methodology? So paragraph 35, I think, in the search warrant is the best illustration of that. It talks about how most of the target residences in this case were identified by linking vehicle registrations from one property to another in order to identify new properties. And you have to have probable cause to your specific house, right? So that might be just general background information about how they conducted it. But at the end of the day, you've got to have a specific link. So I don't really see that that adds anything in terms of probable cause to search this particular home. I think out of the three things I just cited, it's the least important. I do think, however, because of the way the warrant's drafted, paragraph 35 comes right before the surveillance section, which then proceeds to explain all these identifications of different target residences. So there's a reasonable inference that can be drawn that that process was followed in this case, including to identify the Doan Drive residents. Additionally, there's nothing in that affidavit that tells us how that Doan Drive, and I'm sorry, it's the Nevada place is the house we're talking about, how it was identified other than just running high electrical use for the whole neighborhood. Aside from the general statement about investigative methodology, I agree, Judge McHugh, that there's nothing explicit in the warrant that says this is how we became interested in Nevada place in the first instance. And it certainly would have been a lot better if the warrant affidavit provided that information. And it doesn't, nor does it give, subject to the criticism of the clear report that have been made by your colleagues, that does flag Doan as a related address for some inexplicable reason. But the affidavit doesn't explain the officer Padilla's reliance on that data that comes from a law enforcement source. That's correct, Your Honor. But when reading paragraph 37, which talks about Nevada place, in conjunction with paragraph 65, which identifies the Doan Drive residents as the target residents and talks about the electricity usage, both of those paragraphs talk about Yeo Xiong as a person involved. And so there's certainly a reasonable inference to be drawn that there's a linkage between Nevada place and Doan Drive and that both places have elevated electricity usage. And that's all there is, right? You've got two homes with elevated electricity usage and a mistaken belief that there's interaction between the two homes, at least on one occasion. I think what I would add to that is, while I understand that not a great deal of weight should be given to this general statement about investigative methodology, the inclusion of all of the other target residences, some of which were in the same neighborhood, does provide something else. It provides some indication that the investigative methodology is reliable because there's other properties, target properties, 10, 11, 12. There's several others that do show other indications beyond- And if you linked Nevada to one of those properties, a house that had marijuana odor or a house where you can hear the fans or a house where you observed the people running your garbage cans out right before the truck came by and then running them back, I think you'd have a different case. Here, you've tied two homes that have nothing other than high energy use together. They have high energy use and also this name. I guess what I'd like to emphasize is, if the court agrees that the district judge did not clearly err in finding that Officer Padilla was at worst negligent, then the linkage of the names of Yeo Xiong at both properties is still something that the court can and should rely on in evaluating probable cause. Because as this court has said in Campbell and also much more recently in the Ray case, which is unpublished, but it's from 2020, the only statements that are excised in evaluating probable cause are those that are recklessly or intentionally false. As this court said in Campbell, the idea behind the suppression remedy is not to punish government negligence or just honest mistakes. And I think the thing about the clear report, regardless of whether the court looks at the defense exhibit or the government exhibit, the government introduced an excerpt really just to avoid having a 100-page exhibit at the suppression hearing, but produced the entire report to the defense. That, you know, certainly it's the government's argument that when Officer Padilla is first told by his analyst when he's at Nevada Place asking about a vehicle registration, this vehicle with license plates starting with 198 is registered to a person named Yeo Xiong with no middle name. Then what the clear report illustrates is that by running Nevada Place through clear, there is ambiguity in the names, but that comes in the context of AKAs. So, you know, Yeo Lan Xiong has an AKA of Yeo T. Xiong and also several other variations of that name. So I think it was reasonable for Officer Padilla, you know, had he looked at that exact version of the clear report in preparing the warrant to say, this ambiguity is because of a problem with public records. It's not a problem that I have where I'm dealing with two different people that I need to further investigate. And while he did testify at the suppression hearing, he could have looked at DMV photographs and potentially resolved this issue if he had known that he was dealing with potentially two different people. This is really at most just a failure to conduct additional due diligence that would have been possible, which is sort of a garden variety kind of negligence. But even taking that we accept the mistake that these houses are connected, you've connected two houses that don't have any indicia of a marijuana grow operation other than high energy use. You'd agree with that statement, right? If the court has reached the point where it's not persuaded that the investigative methodology and the other target residences are not a relevant consideration. Well, I don't know how the other houses can be a relevant consideration if you don't tie them to Nevada Place. I mean, you know, my neighbor might, you know, be running a meth lab, but you got to connect my house to that operation not to another house that happens to have a pool and a hot tub and has high energy use. So I think there's two things I'd say about that. First of all, there is a waiver issue that I mentioned in the answer brief, and I'd also like to just briefly reemphasize it here that if the court agrees that the district judge didn't clearly err in its finding regarding negligence versus recklessness, then the defense has waived all the remaining escape routes from the good faith exception, because all that they've argued both in their opening brief and their reply is that the court cannot apply the good faith exception because there was a reckless material omission. So if the court ultimately concludes there was no, regardless of materiality, that there was no recklessness, then the court is in the position because of this waiver that the court could decide not to address probable cause initially and simply go to the good faith exception and say, well, we agree with the district court, it wasn't reckless. Therefore, the good faith exception precludes suppression. Your colleagues, they stated that it was more than, the clear report had more than just the AKA naming conventions. There was also a discrepancy, at least on birthdates, which would have been, shouldn't that have been a red flag? I think the clear report is open to interpretation for a lot of reasons. I mean, also on page three of the government's version of the exhibit, which was the four page version, there's a list of possible addresses associated with subject. And the subject in that instance is Yolan Xiang, the actual defendant's name. And one of those possible addresses associated with the subject is Nevada Place. And then another one is Doan Drive. And so I think at worst, I think the clear report kind of points in both directions. And this is an excellent example of why I think that- Shouldn't that ambiguity run in favor of the target's privacy interests and I guess require the government to do a little bit more stake out the house or whatever technique might've taken a dog sniffer around. I don't know how you do it, but should we have expected just a little bit more here to get over the probable causal threshold? I think in this instance, I would respectfully disagree only because Officer Padilla was told by the analyst that was running this information that the registered owner was Yolan Xiang with no middle name. And obviously law enforcement can't shield itself from accountability by obtaining information from other people and saying, oh, we just were told something wrong. But as this court said in Campbell, less than seamless communication among different members of law enforcement is a good example of negligence, not recklessness. There is some room for mistakes in that regard or even negligence. The other thing I would say is that the clear report, it arguably points in both directions, but the district court did have the benefit of Officer Padilla being cross-examined on that clear report, explaining his investigative approach and taking responsibility for this mistake in live testimony. And so I do think that the district court's finding as to negligence and not recklessness rightly deserves that deference and that review for clear error. I can just briefly respond to the sufficiency of the evidence claim. Judge McHugh raised essentially exactly what I was gonna say, which is the jury was instructed on conspiracy and the instructions are in volume one of the Xiang record on appeal, just that two or more persons agreed to violate the controlled substance laws and that the defendant joined that conspiracy. And so while I do think that there was sufficient evidence for the jury to conclude that Mr. Yan conspired with his wife, there was also sufficient evidence based on the expert testimony and the heaviness of the equipment that he also could have conspired with any number of unknown individuals. I'm having trouble remembering right now, but what was the testimony about whether the officers could smell the marijuana once they were in the house before they opened the basement door? Do you remember? I believe it was officer Gonzalez who testified that essentially once he walked in the door, it was immediately apparent to him. And I believe special agent McVeigh provided some information about that, although he was later onto the scene, probably after that basement door had been open for quite some time. So I think officer Gonzalez is really the key witness on that. And if there are no more questions from the court, I'll forego the remainder of my time and I'd ask that you affirm. Thank you, counsel. It's rebuttal from Ms. Shen. Thank you. I just want to make, I think, three basic points sort of following the government structure. You know, first, just going back to this general lines on investigative methodology, I think that the government's argument is squarely foreclosed by this court's precedents, including United States versus Roach, 582 F3rd 1192. That case was actually really similar kind of shotgun affidavit where there's all this stuff about a big investigation. And then when they get to this specific house, they just say, you know, we verified that the suspect lives at this house. And this court said, you know, that's not sufficient to give rise to probable cause. You actually have to show the facts that verified that for you. You can't just assert that it was verified. You know, second, I just want on the linkage, the linkage was reckless. You know, even apart from the clear report, there were numerous reasons to doubt that these two people were the same person, including just the background fact that you can't assume two people with the same name are the same person. I think that's really basic assumption that we expect law enforcement, especially to understand. And I think this is exactly the kind of carelessness that really warrants deterrence under the exclusionary rule. And so, you know, once you take those two things out, even under the government's, you know, sort of characterization of the warrant that really leaves only the elevated electricity usage and the government doesn't seek to justify the warrants solely on that ground. And I don't think this court should either, you know, as we've discussed, there's, you know, while elevated electricity usage is consistent with illegal marijuana cultivation, it's equally consistent with other innocent conduct and, you know, leaving, saying that elevated electricity usage was enough would, as Mr. Myrie pointed out, you know, leave us open to being searched anytime our electrical usage got too high, especially if you happen to be somebody with a Chinese name who lives in the Denver metro area. And there's apparently a history of Chinese pot growers. And so for all of these reasons, I ask that the court reverse the denial of the motion to suppress. Thank you. Thank you, counsel. Appreciate the arguments. Your excuse in the case shall be submitted.